UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD M. FELDER, RONALD W. ROUSSEAU, and LISA G. BULLARD,

Plaintiffs, on behalf of themselves and all others similarly situated

\- against -

JOHN WILEY & SONS, INC., and DOE AFFILIATED ENTITIES 1-10,

Defendants.

Case No.: 1:26-CV-07221

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Richard M. Felder, Ronald W. Rousseau, and Lisa G. Bullard (collectively, "Plaintiffs" or the "Authors"), on their own behalf and on behalf of similarly situated class members (the "Class" or "Class Members") with respect to the class allegations, by and through their attorneys, Slarskey LLC, bring this action against Defendant John Wiley & Sons, Inc., and its parents, subsidiaries, divisions, affiliates, and successors in interest Doe Affiliated Entities 1-10 (collectively, "Wiley" or the "Company"). With knowledge of their own acts and acts occurring in their presence, and upon information and belief as to all other matters, Plaintiffs allege the following:

## NATURE OF CASE

1. This is a class action that asserts claims for breach of contract against Wiley, a multinational educational publishing company. Plaintiffs bring this action on behalf of a Class, as defined below, of authors who have contracted with Wiley (or one of its predecessors-in-interest or affiliates) for Wiley to publish, sell, and distribute their works, pursuant to publishing

agreements that provide for the payment of royalties on the net dollar receipts from the sale of their works ("Publishing Agreements").

2. This case arises out of Wiley's breach of its contracts with authors by its unilateral and improper reduction of the royalties it pays to authors when it sells their textbooks, works, or parts thereof, through its digital learning platform, WileyPLUS. The Publishing Agreements each require that Wiley pay Plaintiffs royalties on the net dollar receipts—that is, the sales price—it earns and receives from each sale of their works, without deducting Wiley's own costs of publishing the work in digital form. Wiley, however, has adopted a policy of systematically apportioning the revenues received from the sale of works available on its WileyPLUS platform—allocating only 65% of those receipts to the royalty base available to authors and retaining 35% for itself—thereby shorting authors the royalties they are owed and enriching Wiley at the authors' expense. Wiley's financial alchemy violates the terms of the Publishing Agreements and amounts to a violation of Wiley's duty of good faith and fair dealing.

3. As a textbook publisher, Wiley provides a platform to authors for the distribution of their works. For much of the Company's history, Wiley published textbooks on a print platform with paper and ink.

4. As more and more students and educational institutions have adopted or moved to electronic platforms in recent years, royalties on sales of electronic textbooks have become a crucial component of the overall income of the authors of those books. Many authors of textbooks sold by Wiley are academics who supplement their incomes from their educational endeavors with royalties from sales of their works.

5. Wiley operates an online platform called "WileyPLUS," which it uses to distribute electronic textbooks together with course materials. WileyPLUS is, in essence, a replacement for

paper versions of books. The electronic textbook is the central element of each WileyPLUS offering and represents an electronic version of the author's work.

6. The accompanying features offered through WileyPLUS—such as videos, animations, practice questions, adaptive and personalized questions, and student performance analytics—are derived from the authors' works themselves and are offered in conjunction with those works. They are not commodities in their own right and have little to no market value when sold separate and apart from the textbook. Nor are those accompanying features Wiley's own creation. In substantial part, it is the authors—including Plaintiffs—who write, select, or identify the reading questions, practice and homework problems, worked solutions, videos, and other instructional content that Wiley then loads into the WileyPLUS template. That author-contributed content is itself part of the "Work" under the Publishing Agreements, which define the "Work" to include the material an author contributes to the supplementary or ancillary materials that accompany it. Wiley's uniform 65/35 apportionment takes no account of it.

7. Until recently, Wiley did not disclose to the Authors that it has, for years, been apportioning the net dollar receipts from sales and rentals of the WileyPLUS version of their Work (defined below)—paying royalties on only 65% of those receipts and retaining 35% as supposed compensation for the platform. Wiley has applied this 65/35 apportionment across the board to WileyPLUS titles in all fields, likely affecting hundreds of works or more.

8. Wiley's apportionment of WileyPLUS receipts contravenes the terms of its contracts with its authors. The Publishing Agreements require Wiley to pay royalties based on Wiley's "net dollar receipts" from sales of the Work, and require Wiley to publish the Work "at its own expense." WileyPLUS is the means by which Wiley publishes and delivers the Work in digital form, and the author-contributed materials that accompany it fall within the defined term "Work." The platform, software, and supporting technology are not "other products" within the

meaning of the contracts' apportionment provision; they are Wiley's own means and cost of publishing the Work. Wiley therefore may not deduct or apportion away those costs before calculating royalties.

9. Wiley's royalty reduction is equivalent to reducing royalties for sales of paper textbooks based on Wiley's costs of printing those books, which would also violate the explicit terms of the contracts. Traditionally, the higher-education industry has not deducted from the royalties owed to authors the cost to publish and market a hard copy of a work, such as the costs of paper, printing, and binding. This is for good reason: the Publishing Agreements, which entitle Wiley to the overwhelming majority of the money it receives from textbook sales, already account for Wiley's contributions to the final product.

10. Separately, the apportionment constitutes a breach of Wiley's duty of good faith and fair dealing. By unilaterally and without notice redefining the "price" of authors' works as only a fraction—65%—of the revenues Wiley receives for the sale of those works, Wiley has arbitrarily reduced the amounts on which royalty payments are due. In so doing, Wiley has deprived the Authors of the benefit of their bargains and has improperly enriched itself at the expense of the authors.

11. Wiley's unilateral action has caused, and continues to cause, a substantial reduction in the royalties paid to authors on the sales and rentals of textbooks sold for use on WileyPLUS—a significant blow to academics who rely on those royalty payments.

12. This action seeks damages from Wiley on behalf of a Class of authors, as defined below, who have contracted with Wiley and who have been harmed by its reduction in royalty payments. This action further seeks injunctive relief preventing Wiley from apportioning the net dollar receipts of WileyPLUS sales in the absence of revised agreements with authors, and a declaratory judgment that Wiley's apportionment violates authors' contracts with the Company.

## PARTIES

13. Plaintiff Richard M. Felder ("Professor Felder") is a textbook author who entered into a Publishing Agreement with Wiley. Professor Felder is the Hoechst Celanese Professor Emeritus of Chemical Engineering at North Carolina State University, and is a co-author of the book "Elementary Principles of Chemical Processes" (the "Work"), which is published by Wiley and is currently in its Fourth Edition (2018). Professor Felder is the inaugural recipient of the Lifetime Achievement Award in Engineering Education, presented in 2012 by the American Society for Engineering Education, and is a recognized leader in the field of engineering education. As described herein, Professor Felder was harmed when Wiley breached its contract with him by reducing the royalty payments he receives on sales and rentals of his book through WileyPLUS.

14. Plaintiff Ronald W. Rousseau ("Professor Rousseau") is a textbook author who entered into a Publishing Agreement with Wiley. Professor Rousseau is a professor of Chemical Engineering and C.J. "Pete" Silas Endowed Chair Emeritus at the Georgia Institute of Technology, and is a co-author of "Elementary Principles of Chemical Processes," published by Wiley. Professor Rousseau is, with Professor Felder, an original author of the book and a recognized leader in the field of engineering education. As described herein, Professor Rousseau was harmed when Wiley breached its contract with him by reducing the royalty payments he receives on sales and rentals of his book through WileyPLUS.

15. Plaintiff Lisa G. Bullard ("Professor Bullard") is a textbook author who entered into a Publishing Agreement, as defined below, with Wiley. Professor Bullard is an emeritus professor of chemical engineering at North Carolina State University, and is a co-author of "Elementary Principles of Chemical Processes," published by Wiley. Professor Bullard was added as a co-author for the Fourth Edition of the Work. As described herein, Professor Bullard was

harmed when Wiley breached its contract with her by reducing the royalty payments she receives on sales and rentals of the book through WileyPLUS.

16. Defendant Wiley is a New York corporation with its headquarters located at 111 River Street, Hoboken, New Jersey 07030. Wiley is a multinational educational and academic publishing company that serves the higher-education, professional, and research markets worldwide. Wiley is a party to the Publishing Agreements entered into by the Authors and members of the Class.

## JURISDICTION

17. This Court has subject-matter jurisdiction over the claims alleged herein pursuant to 28 U.S.C. § 1332(d).

18. This action is brought on behalf of a class of more than 100 authors who reside primarily outside the State of New York, and at least one member of the Class is a citizen of a State different from that of Wiley.

19. Each of the named Plaintiffs is a citizen of a State different from that of Wiley, which is incorporated in the State of New York and maintains its principal place of business in the State of New Jersey.

20. The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs.

21. This Court has personal jurisdiction over Wiley, and venue is proper in this District, because Wiley expressly consented to jurisdiction and venue in this District. Section 13 of the Authors' Publishing Agreement provides that the Agreement "will be construed and interpreted according to the laws of the State of New York," that "any legal action will be instituted in a court of competent jurisdiction in New York County," and that "each party consents and submits to the personal jurisdiction of such court, waives any objection to venue in such court, and consents to

service of process." The Publishing Agreements of the Class Members contain the same or substantially similar choice-of-law, jurisdiction, and venue provisions.

22. Venue is therefore proper in this District under 28 U.S.C. § 1391 and pursuant to the parties' contractual forum-selection clause. Wiley also conducts a substantial amount of business in this District, including contracting with members of the Class and selling and distributing the works of Class Members.

## FACTUAL ALLEGATIONS

### A. Wiley and the Migration to Digital Learning Platforms

23. Wiley is one of the world's oldest and largest academic and educational publishers. The core of Wiley's higher-education business is publishing educational textbooks. As a textbook publisher, Wiley provides a platform to academics and other authors for the distribution of their works.

24. Higher-education textbooks traditionally have been lucrative to publishers. The industry is dominated by only a handful of publishers, including Wiley.

25. Over time, Wiley has migrated many of its offerings from print textbooks to digital solutions. Digital content has become an increasingly important facet of Wiley's business, and digital formats now account for a large and growing share of Wiley's higher-education sales and rentals.

26. Wiley's own reporting confirms the scale of that migration. In its FY2026 Form 10-K, Wiley describes itself as "a predominantly digital company," reports that 85% of its revenue for the year ended April 30, 2026 was generated by digital products and services, and reports that approximately 62% of the revenue of its Learning segment—which includes its courseware business—was from digital and online products and services.

### B. Wiley Launches WileyPLUS

27. WileyPLUS traces back to eGrade Plus, which Wiley launched in fiscal year 2004 and subsequently rebranded as WileyPLUS in or about 2005.

28. WileyPLUS is an online teaching and learning platform—described by Wiley as an online product that combines electronic versions of texts with media resources and tools for instructors and students. It is intended to provide a single source from which instructors can manage their courses, create presentations, and assign and grade homework and tests, and through which students can receive assistance and explanations as they work on assignments and link back to the relevant sections of the text. WileyPLUS is among Wiley's core digital platforms for textbook delivery.

29. The WileyPLUS platform is a single online location where teachers and students can access electronic textbooks and course materials, complete assignments, and track performance. The electronic textbook—an electronic version of the author's work—is the central element of each WileyPLUS offering.

30. The features offered through WileyPLUS include the electronic textbook—identical to its print form—together with media resources such as videos, animations, auto-graded practice problems, adaptive and personalized questions, and student performance analytics and reporting. Wiley describes the assessment content in WileyPLUS as "author-branded," and many of the resources present worked solutions and illustrations drawn directly from the textbook.

31. Authors do not merely supply the manuscript that Wiley converts to digital form; they also generate much of the supplementary content that populates a WileyPLUS course. In the case of the Authors' Work, the Authors developed, wrote, or identified a substantial portion of the materials that Wiley placed into WileyPLUS, including reading questions, practice and homework problems and their worked solutions, and videos and other instructional resources. Wiley took that

author-created content and loaded it into the WileyPLUS template. On information and belief, the same is true of many other titles offered on the WileyPLUS platform, the authors of which developed or identified a significant portion of the supplementary content that Wiley delivers through WileyPLUS. The content that populates a WileyPLUS course is thus in substantial part the authors' own work product, and not Wiley's.

32. The supplementary materials available through WileyPLUS are derived from the authors' works themselves, and cannot be purchased separately from an ebook. The majority of those materials are textbook-specific, meaning that they are designed to be used in conjunction with a particular textbook, and they commonly draw directly from the associated textbook.

33. The textbook is the necessary component of WileyPLUS. Educators and students continue to seek high-quality textbooks for their courses, and the books form the basis of the courses and supplementary materials built around them. If the authors did not produce the textbooks, Wiley would not be able to market WileyPLUS for those courses; without the textbook, the other applications of the platform are of little or no use.

34. Instructors adopt WileyPLUS by selecting a particular textbook and creating a course around it. Each WileyPLUS course is specific to the adopted textbook, and the platform's functionalities—including the integrated ebook, assignment and assessment tools, and course resources—are tied to the text of that book. It is the adoption of the textbook that makes the corresponding WileyPLUS course and content available.

35. Students gain access to WileyPLUS-hosted textbooks through registration and access credentials associated with their course. While some students access the materials directly through the WileyPLUS site, WileyPLUS is designed to integrate directly with the Learning Management Systems already in use at colleges and universities throughout the United States—including Blackboard, Canvas, Desire2Learn/Brightspace, and Moodle. Through this integration,

Wiley provides single sign-on, allowing instructors and students to reach all WileyPLUS content with one login; integrated student registration from within the institution's own course; direct and "deep" links to individual readings, chapters of the online textbook, and assignments; and gradebook synchronization that posts WileyPLUS scores back to the institution's gradebook. Many students who access the Work through such integrations may never visit the WileyPLUS site directly and may not even know that they are using WileyPLUS.

36. Each WileyPLUS offering is sold or rented as a single unit for a single, unitary price. The supplementary WileyPLUS materials are not made available for sale separate and apart from the textbook, reinforcing that the platform and its accompanying materials are simply a content-delivery system for Wiley textbooks and not commodities in their own right. To the extent any such materials have been offered separately, they have little to no market value or adoption when sold separate and apart from the textbook.

37. Wiley also delivers digital course content to students through "inclusive access" arrangements, in which the charge for the content is billed through the student's institution rather than paid at retail. In its FY2026 Form 10-K, Wiley identifies inclusive access as one of the channels through which it drives "accessibility for print and digital materials within the higher education market," and describes it as a channel "whereby the cost of digital course content is added to a student's tuition and fees." In those arrangements, as with the sale of WileyPLUS access codes, Wiley receives a single, undifferentiated amount for delivery of the Work in digital form, with no portion of the charge separately stated for any purported other component.

38. A large proportion of the Work's sales and rentals are of the WileyPLUS version. As reflected in Wiley's own published price list for the Work, WileyPLUS is offered in multiple configurations—including single-term and multiple-term access, and access bundled with a permanent electronic copy of the textbook or with a loose-leaf print copy—each sold for a single

price. For example, single-term access to WileyPLUS for the Work is listed at $82.95, and multiple-term access at $145.95, with bundled configurations listed at higher prices.

39. WileyPLUS is, in substance, a content-delivery platform that is functionally equivalent to the paper on which print copies of textbooks are printed, and serves in essence as a replacement for paper versions of books. It is one of the formats in which Wiley publishes the Authors' Work.

40. Wiley describes WileyPLUS the same way in its own public filings, and classifies it there as a platform through which Wiley makes book content available rather than as a product separate from the book. In its FY2026 Form 10-K, under the heading "Digital Courseware," Wiley reports that it offers "online learning solutions, including WileyPLUS, an online education platform that is integrated with a digital textbook." In the "Print and Digital Publishing" discussion of its Academic business in the same filing, Wiley reports that "[b]ook content is available online through Wiley Online Library, WileyPLUS™, zyBooks®, alta®, and other proprietary platforms."

## C. The Wiley Publishing Agreements

41. Wiley's business model is premised on entering into publishing agreements with academic authors, pursuant to which (1) the author agrees to produce an academic textbook and grant the related copyrights to Wiley; (2) Wiley agrees to publish and sell the textbook at its own expense; and (3) the author earns a per-sale percentage royalty on the sales of the work.

42. Regardless of sales volume, the royalty payments on sales of authors' works constitute an important part of their income. This is especially so for academics, who often rely on royalty payments from Wiley to supplement their incomes.

43. The Publishing Agreements under which Wiley has sold works for use on WileyPLUS are substantially similar in all respects relevant to this action. They govern the terms of the authors' performance and Wiley's payments to the authors for sales of their "Work," and

provide for (1) a royalty rate, applied to (2) the amount of money Wiley receives, from (3) the sale of the Work—regardless of the format, title, or delivery platform Wiley chooses to use for the sale of the Work. Wiley drafted those agreements on its own standard forms, and the provisions at issue here—the obligation to publish the Work at Wiley's own expense, the definition of the receipts on which royalties are computed, and the single circumstance in which Wiley may allocate a portion of those receipts away from the Work—appear in materially the same terms across them. To the extent Wiley has since circulated revised forms that omit or alter those provisions, such forms do not govern the sales at issue in this action.

**D. Relevant Contract Provisions**

44. On August 12, 2013, the Authors entered into a Publishing Agreement with Wiley (the "Authors' Agreement") with respect to the Work tentatively titled "Elementary Principles of Chemical Processes, 4th Edition." The Authors' Agreement superseded and replaced prior agreements between the parties, including the agreement dated July 10, 1975, as amended on June 6, 1990, March 22, 1999, and September 16, 2009, with respect to the Work.

45. Section 1(a) of the Authors' Agreement grants Wiley the exclusive copyright in the Work and the exclusive right to "reproduce, publish, distribute, transmit and sell the Work and derivative works, in whole or in part in all media and forms of distribution." That section further provides that, "[f]or purposes of this Agreement, the term 'Work' will include any material contributed by the Authors to any supplementary or ancillary materials which may accompany the Work."

46. Section 3(a) of the Authors' Agreement requires Wiley to publish the Work at its own expense:

> ***The Publisher will publish the Work, at its own expense***, in such formats as it deems appropriate for the market, and will determine and implement all aspects of publication such as price, style, quantity, appearance and design, as well as such

> marketing, distribution and licensing arrangements as it deems appropriate for the successful launch of the Work into the marketplace. (Emphasis added.)

47. Section 4(a) of the Authors' Agreement sets forth the royalties due to the Authors, expressed as percentages of Wiley's "net dollar receipts" from sales or licenses of the Work. Section 4(a)(i) is the relevant provision here, and provides for royalties on domestic sales of the Work:

> The Publisher will pay to the Authors the following percentages of ***the Publisher's "net dollar receipts"*** (as defined below) from sales or licenses of the Work, whether directly by the Publisher or indirectly through or with others: (i) on sales of the Work, whether in print or in digital form, in the U.S. and its territories, the following royalties except as provided below: 18%. (Emphasis added.)

48. Section 4(a) of the Authors' Agreement defines "net dollar receipts":

> "Net Dollar receipts" are defined as ***United States Dollars earned and received*** by the Publisher less any discounts, taxes, bad debts, customer returns and excluding any sums charged separately to the customer for shipping. Sales or licenses made to any subsidiary or affiliate companies shall be treated as though made to unrelated parties. (Emphasis added.)

49. The definition of "net dollar receipts" is precise. It identifies an exhaustive list of the items that Wiley may deduct from the dollars it earns and receives before calculating an author's royalty—namely, discounts, taxes, bad debts, customer returns, and separately charged shipping. The definition does not state that the deductibles merely "include" those items, and it does not mention any platform fee, apportionment, development cost, or other publishing expense. Because the enumerated items do not include publishing costs, the Authors' Agreement does not permit Wiley to deduct or apportion away publishing costs when calculating net dollar receipts.

50. Section 4(a) of the Authors' Agreement contains a single, narrow apportionment provision, applicable only when the Work is packaged or sold together with separate products:

> When the Publisher packages or sells the Work or any part of it together with other products, the Publisher will allocate to the Work that portion of the proceeds that is equal to the proportion that the Work or part of it bears to the entire product, and apply the appropriate royalty rate.

51. By its plain terms, the apportionment provision of Section 4(a) applies only "[w]hen the Publisher packages or sells the Work . . . together with other products." The WileyPLUS materials that accompany the Authors' textbook are not "other products." To the contrary, WileyPLUS is the digital format in which Wiley publishes the Work, and the author-contributed materials accompanying it are part of the "Work"—Section 1(a) of the Agreement expressly defines "Work" to "include any material contributed by the Authors to any supplementary or ancillary materials which may accompany the Work." The supplementary WileyPLUS materials are designed around the Authors' textbook, are textbook-specific, draw directly from the textbook, are in substantial part created or identified by the Authors themselves, and have little or no independent market value. They are content-delivery features of the Work—not separate "other products" that trigger apportionment.

52. Section 4(c) of the Authors' Agreement provides that "[n]o royalties will be paid on . . . ancillary materials that may accompany the Work unless covered by a separate written agreement between the parties." Wiley does not attribute the 35% it withholds from a WileyPLUS sale to ancillary materials accompanying the Work. Wiley attributes that share to "the platform and supporting technology tools"—the means by which it delivers the Work in digital form—and withholds the same 35% from every WileyPLUS title, without regard to what ancillary materials, if any, accompany a given title. Wiley does not separately price or separately sell any material delivered through WileyPLUS; a WileyPLUS purchase is a single, undifferentiated payment for delivery of the Work in digital form.

53. Wiley's Publishing Agreements with other textbook authors whose works have been sold for use on WileyPLUS share the same key provisions:

a. The author delivers a manuscript of the Work, which Wiley must publish at its own expense and in such formats as it deems appropriate for the market.

b. Royalties are paid as a percentage of Wiley's "net dollar receipts" from the sale of the Work, in print and digital editions.

c. "Net dollar receipts" is defined as the dollars earned and received by Wiley, less an exhaustive list of enumerated items that does not include the costs of publishing or any platform or apportionment charge.

d. Apportionment is permitted only when the Work is packaged or sold together with separate "other products."

e. No provision of the agreements authorizes Wiley to reduce the receipts on which royalties are computed by Wiley's own costs of publication.

54. The key terms of Wiley's Publishing Agreements are substantively the same for each Class member, although each contract may set forth a different royalty percentage due on the sales of that author's works. Regardless, the royalty base is substantively the same across agreements: net dollar receipts from sales of the Work, in print and digital format.

**E. Wiley's Unlawful Apportionment of Authors' Royalties**

55. Wiley sells and rents the WileyPLUS version of the Authors' textbook as a unit for a single, unitary price. Under the Publishing Agreements, Wiley is required to pay the Authors royalties based on the "net dollar receipts" from those sales and rentals—that is, the dollars Wiley earns and receives, less the enumerated deductions of discounts, taxes, bad debts, customer returns, and separately charged shipping.

56. Wiley's own public filings confirm that a WileyPLUS sale is a single, bundled transaction that includes the Authors' Work and is sold to the customer for one price. In its FY2024-FY2026 Forms 10-K, Wiley reports that it recognizes revenue under the five-step model

of ASC 606, under which it identifies the performance obligations in a contract, determines the transaction price, and allocates the transaction price among the performance obligations.

57. With respect to its digital courseware products, including WileyPLUS, Wiley reports that "[c]ourseware customers purchase access codes to utilize the product," and that revenue "is recognized over time in the period from when the access codes are activated over the applicable semester term to which such product relates." In its FY2024 Form 10-K, Wiley further disclosed that a courseware purchase "could include single or multiple performance obligations based on the number of course ISBNs purchased"—confirming that the digital edition of the Work is itself a component of, and is delivered through, the unitary WileyPLUS purchase. The Authors do not seek royalties on any product other than their Work; because WileyPLUS is the format in which Wiley publishes the Work in digital form—and the costs of that platform are Wiley's own publishing expense, not the price of a separate product—the Authors seek royalties on the net dollar receipts Wiley earns and receives for each WileyPLUS sale or rental of the Work, with no amount deducted for Wiley's own platform and publication costs.

58. Wiley's own filings further confirm that the platform component it carves out of a WileyPLUS sale has no genuine stand-alone market price against which any allocation could honestly be measured. Wiley reports in its FY2024-FY2026 Forms 10-K, with respect to its print and digital publishing, that each book "is represented by an International Standard Book Number (ISBN), with each ISBN representing a performance obligation," and that "[e]ach ISBN has an observable stand-alone selling price as Wiley sells the books separately."

59. Wiley reports no comparable stand-alone selling price for the WileyPLUS platform: the platform is not sold to these purchasers as a separate product, but only as the means by which Wiley delivers the Work in digital form. Because the platform has no stand-alone market price, the 35% that Wiley withholds as a supposed "platform" share is not tethered to any arm's-

length valuation of a separate product; it is a figure Wiley sets unilaterally. As Wiley's accounting treatment of its platform costs confirms (*see* ¶ 67, *infra*), that 35% is in substance a recovery of Wiley's own cost of publishing the Work in digital form—a cost that Section 3(a) requires Wiley to bear at its own expense and that the definition of "net dollar receipts" does not permit Wiley to deduct.

60. Taken together, Wiley's disclosures, including those described above (*see* ¶ 40, *supra*), confirm that the WileyPLUS edition of the Work is the Work delivered in a digital format—not the Work packaged with a separate, independently marketed product. The platform through which Wiley delivers the Work is not an "other product" within the meaning of Section 4(a); it is the means of publication, and it carries no stand-alone market price of its own. Wiley's deduction of a 35% "platform" share is therefore not a permitted apportionment of proceeds between the Work and a separate "other product," but an impermissible shifting onto the Authors of Wiley's own expense of publishing the Work in digital form, in breach of Section 3(a) and the definition of "net dollar receipts" in Section 4(a). Because no portion of a WileyPLUS sale is properly apportioned away from the Work, the Authors are entitled to royalties on the full net dollar receipts Wiley earns and receives from each WileyPLUS sale or rental of the Work.

61. The Authors first learned on January 14, 2026 that, for years, Wiley has not been paying royalties on the entire net dollar receipts of the WileyPLUS version of their Work. Instead, Wiley has been apportioning those receipts, allocating only 65% to the royalty base on which the Authors' royalties are calculated and retaining 35% for itself. Wiley has applied this 65/35 apportionment to its WileyPLUS titles across the board, in all fields, affecting likely hundreds of works or more.

62. Wiley did so unilaterally and without prior notice to or agreement from the Authors. The 65/35 apportionment is found nowhere in the Publishing Agreements, and the supposed 35%

"platform" share corresponds to no item that the Agreements permit Wiley to deduct from net dollar receipts.

63. Wiley has confirmed as much in its own words, acknowledging in a February 25, 2026 email to the Authors that "author royalties were calculated on 65% of the courseware's net revenue" while "the remaining 35% of net revenue was allocated to the platform and supporting technology tools." By its own account, then, Wiley pays royalties only on the portion of the receipts it unilaterally attributes to the Work, to the exclusion of the portion it attributes to the platform and supporting technology tools—the relative value of which Wiley fixes by its own determination, and not by reference to any stand-alone market price or arm's-length valuation of a separate product.

64. Wiley's apportionment constitutes a breach of contract in multiple ways. First, it violates the explicit terms of the Publishing Agreements by introducing new terms that are not present in the Agreements. Wiley pays royalties based on only a 65% slice of the receipts attributed to the WileyPLUS sale—a basis found nowhere in the Agreements. The Agreements instead require Wiley to pay royalties based on "net dollar receipts," which is defined as the dollars earned and received less an exhaustive list of enumerated items that does not include any platform fee or apportionment.

65. Second, the apportionment violates the provisions of the Publishing Agreements that prevent Wiley from passing its publication costs to authors. Two provisions are relevant: the requirement in Section 3(a) that Wiley publish the Work "at its own expense" in such formats as it deems appropriate for the market, and the definition of "net dollar receipts" on which royalties are paid. By requiring Wiley to publish the Work "at its own expense," the Agreements expressly require Wiley to absorb the costs of publication, including the costs of publishing the Work in digital formats such as WileyPLUS. Similarly, the definition of "net dollar receipts" sets forth an

express, exhaustive list of items that may be deducted; publication costs and platform fees are not among them. Moreover, the terms of the Agreements already account for Wiley's contributions and publication costs: the Authors' royalty rates—here, 18% of net dollar receipts on domestic sales—provide Wiley the lion's share of the revenue from sales of the Work, including revenue to pay for any expenses or work it contributes to the sale of the Work.

66. Wiley's decision to apportion away a portion of the receipts associated with its online platform to offset its costs is no different from a decision to discount royalty payments to offset its costs of building a printing press, purchasing paper, or supplying ink in publishing paper books. Both are breaches of the Publishing Agreements. WileyPLUS is a content-delivery platform that is functionally equivalent to the paper on which print copies of textbooks are printed. Although Wiley has undoubtedly incurred costs in developing and maintaining WileyPLUS, it is contractually prevented from passing those costs on to authors.

67. Wiley's own financial reporting confirms that it treats the WileyPLUS platform not as a separate product but as its own internal cost of doing business, which it recovers over time through amortization. In its FY2024-FY2026 Forms 10-K, Wiley states that "[o]ther product development costs represent the costs incurred in developing software, platforms, and digital content," that such costs "are capitalized and amortized on a straight-line basis over their estimated useful lives," and that the weighted average estimated useful life of such other product development costs is approximately three years. Wiley thus accounts for the platform as a capitalized cost that it bears and amortizes—the digital analogue of the costs of preparing, printing, and binding a physical copy of the Work—and not as a product carrying an independent market value that may be deducted from the consideration received for a sale of the Work before the Authors' royalty is computed. By effectively apportioning away a "platform" share of the receipts, Wiley shifts a portion of its own capitalized publication cost onto the Authors, in breach of the

requirement in Section 3(a) that Wiley publish the Work at its own expense and inconsistent with the exhaustive list of permitted deductions in the definition of "net dollar receipts" under Section 4(a).

68. Wiley's own statements likewise confirm that the 35% it withholds is a recovery of its own publishing expense rather than the price of a separate product. Beyond the February 25, 2026 admission described above (*see* ¶ 63), Wiley stated in January and April 2026 emails that WileyPLUS's components—including "the platform, software and functionality" and "platform-level services"—"are paid for by Wiley" and are "developed, licensed, and maintained at Wiley's expense." By Wiley's own account, then, the 35% share does not measure the value of any separately marketed product, but instead offsets Wiley's cost of developing, licensing, and maintaining the platform through which it publishes the Work in digital form. Because Section 3(a) requires Wiley to bear that expense, and because the definition of "net dollar receipts" does not permit its deduction, Wiley's subtraction of a 35% "platform" share from the receipts of a WileyPLUS sale is an impermissible shifting of Wiley's own publishing expense onto the Authors.

69. Third, Wiley's apportionment provision—which applies only "[w]hen the Publisher packages or sells the Work . . . together with other products"—does not authorize the 65/35 split. The WileyPLUS materials that accompany the Authors' textbook are not "other products." The WileyPLUS version is the "Work," as the Agreement's own definition of "Work" confirms by including supplementary and ancillary materials contributed by the Authors. That definition is not hypothetical here: the Authors in fact created or identified much of the supplementary content that Wiley delivers through WileyPLUS. Because the platform and its supporting technology are Wiley's own means and cost of publishing the Work rather than separate "other products," the apportionment clause is not triggered, and Wiley may not deduct those costs from the net dollar receipts before calculating royalties.

70. Even if apportionment were permitted under Section 4(a)—and it is not—the 65/35 split that Wiley applied unilaterally, across the board, does not reflect any good-faith allocation of "that portion of the proceeds that is equal to the proportion that the Work or part of it bears to the entire product." Wiley has arbitrarily assigned "value" to the platform in a manner that substantially and improperly undercuts the royalty base attributed to authors, and is not fairly or accurately ascribing portions of its receipts as royalty-bearing versus non-royalty-bearing. Among other defects, the uniform 65/35 split makes no allowance for the extent to which the authors of a given title created or identified the supplementary content delivered through WileyPLUS.

71. Wiley's public statements to its investors confirm that Wiley's investment in the platform and supporting technology to which it attributes the withheld 35% (*see* ¶ 63, *supra*) has been declining, even as the withheld share has remained fixed. On Wiley's June 16, 2026 earnings call for the fourth quarter and fiscal year 2026, Wiley's Chief Financial Officer told investors that Wiley's content and partnership advantages enable it to pursue "an AI-first capital-light model rather than build and defend costly platforms keeping capital requirements low." On the same call, Wiley described a multi-year "tech transformation" comprising "structural cost savings, consolidating facilities, retiring technical debt" and a strategic outsourcing partnership, and reported that its capital expenditures declined from $77 million in fiscal year 2025 to $65 million in fiscal year 2026. Wiley has nonetheless applied the same 65/35 apportionment, unchanged, since imposing it in 2021.

72. As a result of Wiley's apportionment of royalties on WileyPLUS sales and rentals, payments to the Authors and the Class have been significantly reduced, and the Authors and the Class have suffered and will continue to suffer damages. With online learning becoming an increasingly integral part of education, Wiley's apportionment scheme has effectively transferred to itself a significant portion of revenue that should be allocated to authors.

### F. Wiley's Editor Confirmed the Full-Royalty Obligation Before Wiley Reversed Course

73. The Authors' recent discovery of Wiley's apportionment occurred during an exchange with Summers Scholl, an Executive Editor in Wiley's Physical Sciences group, in the course of negotiations over a prospective fifth edition of the Work. In that exchange, Wiley made a series of admissions that confirm the Authors' reading of the Publishing Agreement and expose the 65/35 apportionment as a unilateral and improper departure from it.

74. In the fall of 2025, the Authors asked Wiley to confirm whether it had been paying royalties on 100% of its net dollar receipts from all digital versions of the Work—including WileyPLUS—or whether it had instead apportioned those receipts between purportedly royalty-bearing and non-royalty-bearing components. On October 21, 2025, Wiley's editor responded, in writing, that Wiley "is contractually obligated to pay the full royalty rate on 100% of" Wiley's net dollar receipts "for all digital versions of the work, including WileyPlus and any enhanced versions," and that "[t]he contract does not permit Wiley to split receipts into royalty-bearing and non-royalty-bearing components for these products." Wiley's editor further stated that "no distinction is made between standard and enhanced digital versions (e.g., WileyPlus, multimedia, video, etc.)," all of which "are covered under 'digital form,' unless the product is sold as part of a bundle (in which case a proportional allocation is made)."

75. Ms. Scholl confirmed that position after consulting Wiley's own royalty personnel. As she explained to the Authors in the same October 21, 2025 email, Wiley's "senior manager for royalties confirm[ed] that [the Authors'] 4e [*i.e.*, fourth edition] royalties are calculated on the full amount Wiley earns from digital sales," and that the Authors' royalty statements "are reporting full net receipts." These statements are directly at odds with Wiley's actual practice of paying royalties on only 65% of the net dollar receipts of a WileyPLUS sale, and confirm that

apportionment is triggered under the Agreement only when the Work is sold as part of a bundle with a separate product—not when the Work is delivered through WileyPLUS.

76. When the Authors subsequently sought to have the Agreement's royalty terms confirmed in connection with the prospective fifth edition, Wiley reversed course and, for the first time, disclosed and attempted to justify the 65/35 apportionment. In a January 14, 2026 email, Ms. Scholl sought to "clarify" her October 21, 2025 email, explaining that "[t]he Work makes up 65% of a WileyPlus course and as such Wiley allots 65% of the revenue from sales of WileyPlus to the Work," while "[t]he supporting technology tools (including the platform) and third-party material comprise the remaining 35% of WileyPlus, which are paid for by Wiley." In doing so, Wiley admitted that the 35% share corresponds to costs that Wiley itself bears.

77. In the same January 14, 2026 email, Wiley admitted the true function the 35% share actually serves. Ms. Scholl stated that the supporting technology tools and platform "add value as without them purchasers would have no reason to choose to pay the higher price for a WileyPlus course and would instead choose to purchase the lower priced standalone eBook." By Wiley's own account, then, the platform is not a separately marketed product with its own stand-alone price; it exists to support a price premium on the Work and is offered only in conjunction with the Work. That admission confirms that the WileyPLUS platform is a means of publishing and delivering the Work—not an "other product" with which the Work is packaged.

78. Wiley made the same admission repeatedly in the months that followed, each time confirming that the withheld 35% represents Wiley's own costs rather than the price of a separate product. In a February 25, 2026 email, Ms. Scholl stated that "author royalties were calculated on 65% of the courseware's net revenue" and that "the remaining 35% of net revenue" was "allocated to the platform and supporting technology tools . . . which were paid for by Wiley."

79. Similarly, in an April 15, 2026 email, Wiley described the non-book components of a WileyPLUS course—"assessment tools, instructional software, third-party licensed functionality, and platform-level services"—as components that "are developed, licensed, and maintained at Wiley's expense," and acknowledged that the Authors "no longer received a percentage of revenue generated by components of the courseware that [they] did not contribute to such as the platform, software and functionality." That premise is inaccurate as applied to much of a WileyPLUS course: the Authors did contribute to the assessment and instructional content delivered through the platform, as described above.

80. These admissions confirm that the 35% Wiley withholds is a recovery of Wiley's own publication costs—precisely the costs that Section 3(a) requires Wiley to bear "at its own expense" and that the definition of "net dollar receipts" does not permit Wiley to deduct.

81. Wiley further admitted that it introduced the 65/35 apportionment unilaterally and without the Authors' agreement. In a February 25, 2026 email, Ms. Scholl stated that "[t]he adjustment of royalty was introduced in 2021 across WileyPlus titles," apologized "if this does not correspond to your experience," and—in a subsequent April 15, 2026 email—stated that Wiley could "only assume" that the 2021 communication "unfortunately never arrived" with the Authors.

82. Finally, Wiley confirmed the character of the WileyPLUS materials as part of the Work rather than a separate product. In its February 25, 2026 communication, Wiley acknowledged that "the 'Work' includes everything you create and deliver for the [next] edition—your manuscript and any author-written supplements or ancillary materials," consistent with the definition of "Work" in Section 1(a) of the Authors' Agreement.

83. Taken together, these admissions establish that Wiley is obligated to pay royalties on the full net dollar receipts of a WileyPLUS sale of the Work; that the 35% "platform" share Wiley withholds represents Wiley's own publication costs rather than the price of a separate

product; and that Wiley imposed the 65/35 apportionment unilaterally, beginning in 2021, without the Authors' knowledge or agreement.

### G. Class Allegations

84. Plaintiffs have brought this action as a nationwide class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), on behalf of themselves and all other authors and/or respective successors in interest, and seek certification of a Class defined as follows: All persons or entities who have entered into a Publishing Agreement with Wiley or any of its predecessors or successors in interest in the United States that requires Wiley to publish the Work at its own expense and to pay royalties as a percentage of the net dollar receipts from sales of the Work, whose books are or have been sold or rented on the WileyPLUS platform, and who have been harmed by Wiley's apportionment of net dollar receipts on sales and rentals of WileyPLUS textbooks.[1]

85. This action satisfies the requirements of FRCP 23 and is properly maintained as a class action.[2]

86. Numerosity. The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The precise number of Class Members is unknown to Plaintiffs at this time, but Plaintiffs believe there to be more than one hundred, and likely many hundreds, of Class Members, if not more. Members of the Class may be identified through documents in Wiley's possession.

---

[1] Plaintiffs reserve the right to amend the definition of the Class if further investigation or discovery indicates that the definition of the Class should be narrowed, expanded, or otherwise modified.

[2] Notably, courts have previously upheld complaints brought by authors against publishers on a class basis, based upon common terms in various publishing agreements and common practices by the publisher, to the extent that the plaintiffs seek to litigate common issues of law and fact affecting the class.

87. Commonality. There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions of law and fact include, without limitation:

a. how Wiley calculates the compensation owed to Class Members under the Publishing Agreements for works sold or rented for use on WileyPLUS;

b. whether Wiley breached its contracts with the Class Members by failing to compensate them in accordance with the terms of the Publishing Agreements;

c. whether Wiley improperly apportioned and deducted revenue from the royalty base used to calculate author royalties for WileyPLUS by treating functionalities intertwined with the electronic work as separate and apart from the work;

d. whether the WileyPLUS supplementary materials constitute "other products" within the meaning of the apportionment provision of the Publishing Agreements;

e. whether supplementary and ancillary materials contributed by an author and delivered through WileyPLUS are part of the "Work" under the Publishing Agreements and therefore royalty-bearing;

f. whether Wiley's deduction of a platform share or of design and creation costs from royalty-bearing revenue breaches the express terms of the Publishing Agreements, including the requirement that Wiley publish the Work "at its own expense";

g. whether Wiley's capitalization and amortization of platform and software-development costs as its own product-development expense is consistent with its apportionment of a platform share away from the consideration on which the Authors' royalties are computed;

h. whether Wiley's apportionment breaches the implied covenant of good faith and fair dealing;

i. whether Plaintiffs and Class Members are entitled to damages and the methodology for calculating those damages; and

j. whether the Class is entitled to injunctive and declaratory relief.

88. Typicality. Plaintiffs' claims are typical of the claims of the Class they seek to represent. Wiley's practices have affected all members of the Class in a similar manner—they have all sustained damages arising out of Wiley's uniform apportionment practice.

89. Adequacy. Plaintiffs will fairly and adequately protect the interests of the Class and have retained experienced counsel, competent in the prosecution of class action litigation. Plaintiffs have no interests adverse or antagonistic to the interests of other members of the Class.

90. Superiority. A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein. Plaintiffs do not anticipate that unusual difficulties are likely to be encountered in the management of this class action. A class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender, or the inconsistency in results that might occur if the claims were litigated independently. A class action would achieve substantial economies of scale and assure uniformity of decision with respect to persons similarly situated, without sacrificing procedural fairness.

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT

91. The first cause of action is brought on behalf of all Class Members against Defendant John Wiley & Sons, Inc.

92. The Publishing Agreements are valid, enforceable contracts between Class Members and Wiley. Plaintiffs and the Class Members have performed all of their obligations

under the Publishing Agreements, except to the extent that their obligations have been excused by Wiley's conduct.

93. Wiley has improperly apportioned the net dollar receipts of works sold or rented for use on WileyPLUS, depriving Class Members of royalties they are rightfully owed, and has thereby materially breached the Publishing Agreements in at least the following respects.

94. First, Wiley has breached the requirement in Section 3(a) that it "publish the Work, at its own expense." Delivering the Work to students and instructors through WileyPLUS is one of the formats in which Wiley publishes the Work, and the costs Wiley incurs in developing, operating, and maintaining the platform through which it delivers the Work are publication costs that Section 3(a) requires Wiley to bear. By withholding 35% of the receipts of a WileyPLUS sale as a supposed "platform" share before calculating royalties, Wiley shifts a portion of its own cost of publishing the Work in digital form onto the Authors. Wiley's own financial reporting confirms that it treats the platform as a capitalized cost of its business that it recovers through amortization—not as a separately saleable product—underscoring that the 35% deduction is a recovery of Wiley's own publishing expense. Wiley's deduction of its publishing costs is no different in substance from reducing royalties on a printed book to recover the costs of paper, printing, and binding, and it is a breach of Section 3(a).

95. Wiley has admitted the cost-shifting character of the deduction in its own words, acknowledging, in a February 25, 2026 email, that the "remaining 35% of net revenue" is "allocated to the platform and supporting technology tools," which Wiley stated, in January and April 2026 emails, "are paid for by Wiley" and are "developed, licensed, and maintained at Wiley's expense." Wiley's deduction from the receipts of a WileyPLUS sale of an amount that Wiley itself attributes to the platform—costs Wiley concedes it bears—is thus designed to offset

Wiley's own expense of publishing the Work in digital form, in breach of the requirement that Wiley publish the Work at its own expense.

96. Second, Wiley's deduction is not authorized by any provision of the Publishing Agreements. The Agreements permit apportionment in only one circumstance: under Section 4(a), "[w]hen the Publisher packages or sells the Work or any part of it together with other products," in which case Wiley allocates to the Work "that portion of the proceeds that is equal to the proportion that the Work or part of it bears to the entire product." That clause does not apply here. The WileyPLUS platform and its accompanying materials are not "other products": they are the means by which Wiley delivers the Work in digital form and are designed around, derived from, and dependent on the Work, and Section 1(a) of the Agreement expressly defines the "Work" to include the supplementary and ancillary materials that accompany it—much of which the Authors and Class Members created or identified themselves. Section 4(c), which addresses royalties on ancillary materials accompanying the Work, does not authorize Wiley to reduce the receipts of a sale of the Work by the cost of the platform through which Wiley publishes it. Because the Agreements specify the only circumstance in which the proceeds of a sale may be allocated away from the Work, they do not authorize apportionment in any other, and the definition of "net dollar receipts" permits no deduction for a platform share or publishing cost. Wiley's 35% deduction therefore has no contractual basis, and by taking it Wiley has systematically underpaid Class Members in breach of the Publishing Agreements.

97. Third, because Wiley's deduction is neither authorized by the apportionment clause nor permitted by the definition of "net dollar receipts," Wiley is contractually required to calculate the Authors' royalties on the full net dollar receipts it earns and receives from each sale or rental of the WileyPLUS edition of the Work. The Authors do not seek royalties on any product other than their Work. Because WileyPLUS is the format in which Wiley publishes the

Work in digital form, the platform and supporting technology are Wiley's own means and cost of publishing the Work rather than separate "other products," and the definition of "net dollar receipts" permits no deduction for those costs. No portion of a WileyPLUS sale may therefore be deducted or apportioned away to offset Wiley's own publishing expense, and the Authors are entitled to royalties on the full net dollar receipts of each WileyPLUS sale or rental. By paying royalties on only 65% of those receipts, Wiley has systematically underpaid Class Members the royalties they are owed under the Publishing Agreements, in breach of those agreements.

98. Wiley's own editor and royalty personnel confirmed this obligation, acknowledging in writing, in an October 21, 2025 email, that Wiley is "contractually obligated to pay the full royalty rate on 100% of" its net dollar receipts for all digital versions of the Work, that the contract "does not permit Wiley to split receipts into royalty-bearing and non-royalty-bearing components," and that apportionment applies only where the Work is sold as part of a bundle with a separate product.

99. As a direct and proximate result of Wiley's apportionment and reduction of royalty payments, the Class has been damaged and will continue to incur additional damage, and is entitled to compensation from Wiley for said damage in an amount to be proven at trial.

**SECOND CAUSE OF ACTION:**
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

100. The second cause of action is brought on behalf of all Class Members against Defendant John Wiley & Sons, Inc.

101. The Publishing Agreements are valid, enforceable contracts between Class Members and Wiley. Plaintiffs and the Class Members have performed all of their obligations under the Publishing Agreements, except to the extent that their obligations have been excused by Wiley's conduct.

102. The Publishing Agreements grant Wiley the discretion to set the prices of the works it sells and to determine aspects of publication. Implicit in that discretion is a covenant that Wiley will exercise it in good faith and will not act arbitrarily or irrationally so as to deprive the Authors of the benefits of their bargain.

103. To the extent Wiley contends that the Publishing Agreements permit it to apportion the proceeds of a WileyPLUS sale between the Work and supposed “other products,” Wiley breached the implied covenant of good faith and fair dealing by unilaterally, arbitrarily, and without notice fixing a 65/35 apportionment that it applied across the board to all WileyPLUS titles in all fields, without regard to the actual proportion that the Work bears to the entire product and without any good-faith effort to determine the relative values of the components of a WileyPLUS offering.

104. Wiley’s own admissions confirm the arbitrariness of the 65/35 split: Wiley has conceded that the platform is not separately sold and has no stand-alone price—stating, in a January 14, 2026 email, that without it, purchasers “would have no reason to choose to pay the higher price for a WileyPlus course”—such that the 35% share Wiley assigned to the platform is untethered from any arm’s-length valuation of a separate product and reflects instead Wiley’s own costs, which by Wiley’s admission in that same email “are paid for by Wiley.”

105. Wiley further admitted, in a February 25, 2026 email, that it fixed the 65/35 apportionment in 2021 and applied it uniformly across all WileyPLUS titles to “account for Wiley’s significant investment,” rather than through any title-by-title assessment of the proportion the Work bears to the entire product.

106. Wiley’s uniform 65/35 split is arbitrary for the further reason that it disregards the authors’ own contributions to the content delivered through WileyPLUS. Plaintiffs, and on information and belief, many other Class Members, developed, wrote, or identified a significant

portion of the supplementary content that Wiley loaded into the WileyPLUS template for their titles. Wiley nonetheless withheld the same 35% share for every title, making no adjustment for author-created content and no effort to determine how much of a given WileyPLUS course was in fact created by Wiley rather than by the author. The share Wiley withholds thus bears no relation to who created the content it purportedly compensates.

107. Wiley's own public statements to investors confirm that the 65/35 allocation is untethered from the relative value of the components of a WileyPLUS offering. As alleged above (*see* ¶ 71, *supra*), Wiley tells its investors that it aims to avoid the cost of building and defending platforms, and that its capital investment in the technology to which it attributes the withheld 35% has declined—yet the withheld share has remained fixed since 2021. A publisher exercising its discretion in good faith would have revisited an allocation premised on the relative value of the platform when the cost and character of that platform changed. Wiley did not. The 65/35 split is not the product of measurement or valuation at all; it is a figure that Wiley fixed for its own benefit and has never revisited.

108. By unilaterally redefining the "price" of authors' textbooks as only a fraction of the receipts Wiley actually earns and receives, and by paying royalties only on that diminished base, Wiley has arbitrarily and irrationally set the royalty base in a manner that reduces the royalty payments owed to the Authors and appropriates to Wiley what should go to the authors. Wiley's conduct amounts to a bad-faith effort to enrich itself at the expense of authors.

109. These actions have deprived the Class of the benefit of their bargain with Wiley and have breached Wiley's duty of good faith and fair dealing to the Class.

110. As a direct and proximate result of Wiley's reduction of royalty payments, the Class has been damaged and will continue to incur additional damage, and is entitled to compensation from Wiley for said damage in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment accordingly:

A. Determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, certify the Class defined herein, appoint Plaintiffs as Class Representatives, appoint the undersigned as Class counsel, and direct that notice of this action be given to the Class;

B. Award declaratory relief to the effect that the Class is entitled to the applicable royalty percentage on the entire net dollar receipts of textbooks sold or rented on WileyPLUS, without apportionment for the platform or accompanying materials;

C. Award compensatory damages in favor of Plaintiffs and the other Class Members against Wiley, for all damages sustained as a result of Wiley's wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Award pre- and post-judgment interest;

E. Award injunctive relief prohibiting Wiley from apportioning the net dollar receipts of WileyPLUS sales and rentals, and from otherwise reducing the royalty base on WileyPLUS sales and rentals, in the absence of revised agreements with authors;

F. Award Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G. Award such other and further relief as the Court may deem just and proper.

Dated: New York, New York
August 24, 2026

SLARSKEY LLC

By: */s/ David Slarskey*

David Slarskey
Richard Weingarten
825 Third Avenue, 32nd Floor
New York, New York 10022
*Counsel for Richard Felder, Ronald Rousseau, Lisa Bullard, and the Proposed Class*